UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RANDY RALSTON, et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>COUNTY OF SAN MATEO, et al.,<br><br>　　　　Defendants. | Case No. 21-cv-01880-EMC<br><br>**ORDER GRANTING DEFENDANT COUNTY OF SAN MATEO'S MOTION TO DISMISS**<br><br>Docket Nos. 20, 22 |

Pending before the Court are separate motions to dismiss Plaintiffs' complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) by Defendants County of San Mateo (the "County") and the California Coastal Commission (the "Commission"). *See* Docket Nos. 20 ("Cnty. Mot."); 22 ("Comm'n Mot.").

For the following reasons, the Court **GRANTS** the County's motion in its entirety without leave to amend.[1]

## I.　BACKGROUND

A.　Regulatory Framework

The California Coastal Act of 1976 (CCA), Cal. Pub. Res. Code §§ 30000–30900, "was enacted by the Legislature as a comprehensive scheme to govern land use planning for the entire coastal zone of California," *Yost v. Thomas*, 685 P.2d 1152, 1154 (Cal. 1984). It was intended "to protect the ecological balance of the coastal zone and prevent its deterioration and destruction." *Id.* § 30001. With this goal in mind, the CCA requires "any person . . . wishing to perform or

---

[1] Because the Court grants the County's motion in its entirety, it need not address the Commission's motion.

undertake any development in the coastal zone . . . [to] obtain a coastal development permit." *Id.* § 30006(a).

Because the CCA "rel[ies] heavily on local government and local land use planning procedures and enforcement," it requires "[e]ach local government lying, in whole or in part, within the coastal zone [to] prepare a local coastal program for that portion of the coastal zone within its jurisdiction." *Id.* §§ 30004(a), 30500(a). After the commission certifies a local government's local coastal program (LCP), "the development review authority . . . shall no longer be exercised by the commission over any new development proposed within the area to which the certified [LCP] . . . applies and shall at the time be delegated to the local government that is implementing the [LCP] or any portion thereof." *Id* § 30519(a). In other words, the Commission delegates the issuance of coastal development permits (CDPs) to the local government agency. In doing so, the CCA specifies that "a [CDP] shall be issued if the issuing [local government] agency, or the Commission on appeal, finds that the proposed development is in conformity with the certified [LCP]." *Id.* § 30604(b).

The CCA has a provision explicitly stating that the law cannot be used to effect unconstitutional takings:

> The Legislature hereby finds and declares that this division is not intended, and shall not be construed as authorizing the commission, port governing body, or local government acting pursuant to this division to exercise their power to grant or deny a [CDP] in a manner which will take or damage private property for public use, without the payment of just compensation therefor. This section is not intended to increase or decrease the rights of any owner of property under the Constitution of the State of California or the United States.

*Id.* § 30010. The California Court of Appeal has thus explained that where "the denial of a [CDP] . . . would . . . deprive an owner the productive use of his or her land, the Commission theoretically has two options: deny the [CDP] and pay just compensation; or grant the [CDP] with conditions that mitigate the impacts that limitations were designed to prevent." *McCallister v. Cal. Coastal Comm'n*, 87 Cal. Rptr. 3d 365, 385 (Cal. Ct. App. 2008), *as modified* (Jan. 20, 2009).

B. Facts

Plaintiffs Randy Ralston and Linda Mendiola own an "undeveloped" 5,000-square-foot

parcel ("the Property"), located in San Mateo County, "where they would like to build a modest single-family home." *See* Docket No. 1 ("Compl.") ¶¶ 1, 2, 8, 12. The Property "is not generating any income for Plaintiffs, [] is not known to have generated any income for any prior private owners, [and] . . . is not subject to any restrictive covenants or open space easements." *Id.* ¶¶ 9–10. Plaintiffs have dutifully paid all taxes on the Property since they purchased it. *Id.* ¶ 13.

The County's website lists the Property as "entirely within the 'Montecito Riparian Corridor'" which "is held to the applicable LCP (Sensitive Habitat Component) Policies (7.7-7.13)." *Id.* ¶¶ 15–16 (quoting *Documents, Planning and Building*, County of San Mateo, https://planning.smcgov.org/documents/san-mateo-county-montecito-ripariancorridor (last visited July 20, 2021)). According to Plaintiffs, the County's LCP specifies that land in riparian corridors can "only" be used for certain purposes that do not include residential development. *Id.* ¶ 16. Plaintiffs also allege that "[n]o procedure to obtain a variance, exemption, or other exception from these LCP requirements exists." *Id.* Plaintiffs acknowledge, however, that the County's website "states that '[a]ny intention to proceed with an application for development that would run counter to any of these policies must first be throughly [sic] reviewed by the Community Development Director and County Counsel.'" *Id.* ¶ 18.

Plaintiffs did not apply for a CDP from the County to build their home on the Property. Instead, they "requested review by the County's Community Development Director," also known as the Planning Director, who "consulted with County Counsel and rejected the *intention*, going so far as to state that no home on the Property would be allowed." *Id.* ¶¶ 19–20 (emphasis added). According to Plaintiffs, the Planning Director "stated" the following:

> I reviewed the information you [Plaintiffs] submitted with County Counsel. It is our view that the totality of the circumstances surrounding the recent acquisition of the property, including its purchase price, does not establish that the property owners had a reasonable economic-backed expectation to develop the property as a separate single-family residence such that it would be justifiable to override the Local Coastal Plan limitations on development within wetland and riparian areas in order to accommodate a reasonable economic use.

*Id.* ¶ 20. It is unclear whether this statement was made verbally or in writing.

Plaintiffs also requested, and were denied, a "buildability letter" from the County for the

3

Property. *Id.* ¶ 22–23. The Coastside County Water District (CCWD), which "provides treated water to the part of the County in which the Property is located," "requires the owner to obtain a letter from the County confirming that the property is 'potentially developable' (known as a 'buildability letter')." *Id.* ¶ 21. Without this letter, CCWD will not provide treated water to the Property. *Id.* In refusing to issue the letter, the Planning Director allegedly stated: "I have been looking into the Department's history of issuing such letters, and do not think it would be appropriate for us to issue one in this case, given our response [quoted in paragraph 20 above] to the parcel ownership history you [Plaintiffs] previously provided." *Id.* ¶ 23. Again, it is unclear whether this statement was made verbally or in writing. According to Plaintiffs, they "requested that the County's Board of Supervisors reconsider the matter, or provide compensation for a taking, but the Board of Supervisors refused." *Id.* ¶ 25.

Plaintiffs conclude that "[t]hese decisions *effectively prohibit* Plaintiffs even from *applying* for a [CPD] to build a home on the Property." *Id.* at 24 (emphasis added). The Plaintiffs also allege that "[n]o further administrative remedies exist to challenge the County's *refusal to entertain* a development application, or issue a buildability letter, for the Property," such that "[f]urther requests to reconsider the County's actions would be futile." *Id.* ¶ 32 (emphasis added).

Plaintiffs raise two causes of action pursuant to 42 U.S.C. § 1983, against the County (Count 1) and the Commission (Count 2), for violations of their rights under the Fifth Amendment's Takings Clause. Compl. ¶¶ 34–51. More specifically, Plaintiffs allege Defendants effected an unconstitutional regulatory taking by not allowing them to build their home on the Property.

C.  Procedural Background

Plaintiffs filed their complaint on March 17, 2021. Compl. On June 15, 2021, the County and the Commission filed their respective motions to dismiss. Cnty. Mot.; Comm'n Mot.

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(1), a party may move to dismiss for lack of subject matter jurisdiction. "[L]ack of Article III standing requires dismissal for lack of subject matter jurisdiction under [Rule] 12(b)(1)." *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir.

4

2011).  The "irreducible constitutional minimum" of standing requires a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Nayab v. Capital One Bank (USA), N.A.*, 942 F.3d 480, 489 (9th Cir. 2019) (quoting *Spokeo, Inc. v. Robins* ("*Spokeo II*"), 136 S. Ct. 1540, 1547 (2016)).  These three elements are referred to as, respectively, injury-in-fact, causation, and redressability.  *See Planned Parenthood of Greater Was. & N. Idaho v. U.S. Dep't of Health & Human Servs.*, 946 F.3d 1100, 1108 (9th Cir. 2020).  "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements," which at the pleadings stage means "'clearly . . . alleg[ing] facts demonstrating' each element."  *Spokeo II*, 136 S. Ct. at 1547 (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

A Rule 12(b)(1) jurisdictional attack may be factual or facial.  *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  "[I]n a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction."  *Id.*  In resolving such an attack, unlike with a motion to dismiss under Rule 12(b)(6), the Court "may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment."  *Id.*  Moreover, the court "need not presume the truthfulness of the plaintiff's allegations."  *Id.*

"In a facial attack," on the other hand, "the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction."  *Id.*  The court "resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction."  *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).

Either way, "it is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing."  *Warth*, 422 U.S. 490 at 501; *see also Table Bluff Reservation (Wiyot Tribe) v. Philip Morris, Inc.,* 256 F.3d 879, 882 (9th Cir. 2001) (in assessing standing, the court may consider "the complaint and any other particularized allegations of fact in affidavits or

in amendments to the complaint").

### III. THE COUNTY'S MOTION TO DISMISS

The Court grants the County's motion to dismiss Plaintiffs' complaint in its entirety because their regulatory taking claims are unripe.

A. Ripeness of Regulatory Taking Claims

"Standing and ripeness under Article III are closely related." *Colwell v. Dep't of Health & Human Servs.*, 558 F.3d 1112, 1123 (9th Cir. 2009). "For a suit to be ripe within the meaning of Article III, it must present concrete legal issues, presented in actual cases, not abstractions." *Id.* (quoting *United Pub. Workers v. Mitchell*, 300 U.S. 75, 89 (1947)). "But whereas 'standing is primarily concerned with *who* is a proper party to litigate a particular matter, ripeness addressees *when* that litigation may occur.'" *Id.* (quoting *Lee v. Oregon*, 107 F.3d 1382, 1387 (9th Cir. 1997)). The constitutional ripeness inquiry generally "coincides squarely with standing's injury in fact prong." *Sacks v. Off. of Foreign Assets Control*, 466 F.3d 764, 773 (9th Cir. 2006) (quoting *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc)). Thus, where the court determines that the plaintiff's "stake in the legal issues is concrete rather than abstract," constitutional ripeness is satisfied. *Colwell*, 558 F.3d at 1123.

The Supreme Court had long established a two-part test for determining whether a regulatory taking claim is ripe. First, "a claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a *final decision* regarding the application of the regulations to the property at issue." *Williamson Cnty. Reg'l Plan. Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985), *overruled on other grounds by Knick v. Twp. of Scott*, 139 S. Ct. 2162 (2019) (emphasis added). Second, a regulatory "taking claim is not yet ripe [where the plaintiff] did not seek compensation through the procedures the State has provided for doing so." *Id.* at 194.

However, the Supreme Court repudiated the second prong of this test two years ago in *Knick*, "conclud[ing] that the state-litigation requirement imposes an unjustifiable burden on takings plaintiffs, conflicts with the rest of [its] takings jurisprudence, and must be overruled."

6

*Knick*, 139 S. Ct. at 2167. Thus, under *Knick*, the property owner need not exhaust, for instance, state court proceedings to obtain just compensation before bringing a constitutional claim in federal court. But *Knick* left the first prong of the *Williamson* test intact. In fact, the Supreme Court in the last term reaffirmed the "final rule" requirement several weeks ago. *See Pakdel v. City & Cty. of San Francisco*, 141 S. Ct. 2226, 2228 (2021) (per curiam) ("When a plaintiff alleges a regulatory taking in violation of the Fifth Amendment, a federal court should not consider the claim before the government has reached a *'final' decision*." (emphasis added) (quoting *Suitum v. Tahoe Reg'l Plan. Agency*, 520 U.S. 725, 737 (1997))). "After all, until the government makes up its mind, a court will be hard pressed to determine whether the plaintiff has suffered a constitutional violation." *Id.* Therefore, the question in the instant case is whether Plaintiffs' complaint alleges that the County and the Commission made a "final decision regarding the application of the [LCP] to the [P]roperty," such that their regulatory taking claims are ripe. *Williamson*, 473 U.S. at 186.

The Supreme Court recently explained that the "final decision" requirement "is relatively modest. All a plaintiff must show is that 'there [is] no question . . . about how the 'regulations at issue apply to the particular land in question.'" *Pakdel*, 141 S. Ct. at 2230 (quoting *Suitum*, 520 U.S. at 739). This does not mean that the plaintiff must exhaust all possible state administrative procedures before filing suit in federal court; "nothing more than *de facto* finality is necessary." *Id.* But "a plaintiff's failure to properly pursue administrative procedures may render a claim unripe *if* avenues still remain for the government to clarify or change its decision." *Id.* at 2231. "This requirement ensures that a plaintiff has actually 'been injured by the Government's action' and is not prematurely suing over a hypothetical harm." *Id.* at 2230 (quoting *Horne*, 569 U.S. at 525). In other words, "because a plaintiff who asserts a regulatory taking must prove that the government 'regulation has gone too far,' the court must first 'kno[w] how far the regulation goes.'" *Id.* (quoting *MacDonald, Sommer & Frates v. Yolo Cnty.*, 477 U.S. 340, 348 (1986)). "Once the government is committed to a position, however, these potential ambiguities evaporate and the dispute is ripe for judicial resolution." *Id.*

B.  **Plaintiffs' Regulatory Claim is Not Ripe Because the County Has Not Issued a Final Decision**

Plaintiffs' complaint has not established *de facto* finality because questions remain as to "how the [County's LCP] appl[ies] to the [Property]." *Id.* The preliminary statements by the County's Planning Director cannot constitute a "final decision" for at least two independent reasons: (1) the Planning Director did not have the authority to issue a final decision; and (2) the County cannot issue a final decision until Plaintiffs submit a CDP application.

1.  **The Planning Director Did Not Have The Authority to Issue a Final Decision**

The Planning Director does not have exclusive authority under the County's zoning regulations to issue a final decision on a CDP application. *See* Docket No. 20-2 ("RJN") at Ex. A (San Mateo County, Cal., Zoning Regulations ("Zoning Regulations")) § 6328.9.[2] Section 6328.8 of the County's Zoning Regulations specifies that the Planning Director "shall . . . *forward* an application for a [CDP] together with his *recommendation* thereon to the *appropriate body* specified under Section 6328.9 for its action." *Id.* § 6328.8 (emphases added). Four separate "appropriate bodies" can adjudicate CDP applications in the County: (1) the Planning Director, (2) the Zoning Hearing Officer, (3) the Planning Commission, and (4) the Board of Supervisors. Which of these bodies "acts on" a CDP application depends on the scope of the proposed project, which can vary in five ways. First, if the proposed project requires "other permits or approvals" by the Planning Director, Zoning Hearing Officer, Planning Commission, or Board of Supervisors, then "that person, commission, or board shall also act on the [CDP]." *Id.* § 6328.9(a). Second, if

---

[2] The Court takes judicial notice of the County's zoning regulations because they are public records available on the County's website, and if authentication is necessary, an officer of the County can testify to the authenticity of these documents. Moreover, Plaintiffs do not challenge their authenticity. *See, e.g.*, *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1025 (9th Cir. 2006) (affirming district court's grant of request for judicial notice of documents on file with the City Clerk of the City of Santa Monica and those accessible on Santa Monica's official website); *Gerristen v. Warner Bros. Ent. Inc.*, 112 F. Supp. 3d 1011, 1033 (C.D. Cal. 2015) ("Under Rule 201, the court can take judicial notice of '[p]ublic records and government documents available from reliable sources on the Internet, such as websites run by governmental agencies.'" (quoting *Hansen Beverage Co. v. Innovation Ventures*, LLC, No. 08-CV-1166-IEG POR, 2009 WL 6597891 (S.D. Cal. Dec. 23, 2009)); *Michery v. Ford Motor Co.*, 650 F. App'x 338, 342 n.2 (9th Cir. 2016) (affirming district court's grant of request for judicial notice of the existence of documents available on a government website).

8

the proposed project requires "action on other permits or approvals . . . other than those specified in paragraph (a)," then "the Planning Director shall act on the [CDP]." *Id.* § 6328.9(b). Third, if the proposed project requires "no County permit or approval other than the [CDP]," then "the Planning Commission shall act on the [CDP.]" *Id.* § 6328.9(c). Fourth, if the proposed project requires other permits that are issued by the Planning Director, "but Section 6328.10(a)2 requires a public hearing," then "the Zoning Hearing Officer or Planning Commission, as appropriate, shall act *in place of the Planning Director*." *Id.* § 6328.9(d). Finally, if the proposed project requires a "recommendation of one officer or body to another," then "that officer or body shall make a concurrent recommendation on the [CDP]." *Id.* § 6328.9(e). Put simply, the final decisionmaker depends on what other permits or approvals are required.

Here, it is impossible to tell from Plaintiffs' informal communications with the Planning Director whether their proposed project requires "other permits or approvals" or "a public hearing," such that the Zoning Hearing Officer, Planning Commission, or Board of Supervisors—instead of the Planning Director—must issue the "final decision" on Plaintiff's a CDP application. Indeed, it appears the County might have to hold a public hearing on Plaintiffs' CDP application. According to the County's internal mapping tools, Plaintiffs' parcel is within 100 feet of a known stream. *See* Docket No. 38 ("Cnty's Suppl. Br.") at 2. Section 6328.3(s)(2) states that proposed "[p]rojects in County jurisdiction located . . . within 100 feet of any wetland, estuary, [or] stream" are "appealable to the Coastal Commission." Section 6328.10(2), in turn, specifies that "[t]he appropriate person or body specified in Section 6328.9 shall hold a public hearing prior to any action on a [CDP] where . . . [t]he [CDP] is for a project appealable to the Coastal Commission." If this is true, Plaintiff's proposed project falls under section 6328.9(d), which requires the Zoning Hearing Officer or Planning Commission—not the Planning Director—to issue a final decision on Plaintiffs' CDP application.

Thus, the Planning Director's preliminary statements cannot constitute a "final decision" for purposes of ripeness under *Williamson* and *Knick* because it appears the Planning Director may not have the authority to issue a CDP in this case. Only after Plaintiffs submit a CDP application with all the required components will it become clear which "appropriate body" has the authority

9

to issue a CDP under Section 6328.9.

### 2. The County Cannot Issue a Final Decision Until Plaintiffs Apply For a CDP

There is a second reason why there is no "final decision" here. Section 6328.7 of the County's zoning regulations specifies that an "[a]pplication for a [CDP] *shall* be made to the Planning and Building Division" and "*shall* be accompanied by" a nominal fee, a location map, a site plan, and building elevations. *See* Zoning Regulations §§ 6328.7(a)–(d) (emphases added). Plaintiffs do not allege that they submitted an application to the Planning and Building Division, let alone that they paid the fee or provided the County with a map, site plan, or building elevations. As a result, the Planning Director was unable to issue a final decision explaining in any detail how or why the LCP prevents Plaintiffs from building their home in the Property, nor did he foreclose the possibility that the County might conclude otherwise if Plaintiffs submit a proper CDP application. FAC ¶¶ 20–23. An application for a CDP is important because even if a CDP would normally not be permitted under a certified LCP, the CCA allows for exceptions where a takings occurs. *See* Cal. Pub. Res. Code §§ 30010. As noted, a CDP may be granted with mitigatory conditions. *McCallister*, 87 Cal. Rptr. At 385. Accordingly, Plaintiffs' regulatory taking claim will not be ripe for adjudication until they file a CDP application and the County has "the opportunity to review a sincere development proposal, apply its regulations to that proposal, and decide whether to approve, deny or condition a [CDP]." Docket No. 28 ("Cnty. Reply") at 1.

Notably, the Supreme Court has concluded that regulatory taking claims are unripe in a myriad of cases where—as here—the plaintiffs did not formally apply to develop the properties under the applicable regulations, depriving the regulatory agency from issuing a final decision explaining how those regulations apply to the subject properties. For example, in *Hodel v. Virginia Surface Mining & Reclamation Association, Inc.*, the Supreme Court held that an as-applied challenge of the Surface Mining Control and Reclamation Act of 1977 was unripe because "there is no indication on the record that [the landowners and coal producers challenging the law] . . . request[ed] . . . a variance from the [applicable provisions of the law]." 452 U.S. 264, 297 (1981). Plaintiffs' regulatory takings claim is similarly unripe here because there is no indication on the record that they formally applied, under *McCallister*, for a "[CDP] with conditions that

mitigate the impacts" of their proposed project. 87 Cal. Rptr. 3d at 385. Moreover, the Supreme Court has found that a claim is unripe even *after* a plaintiff applies for a permit in situations where subsequent circumstances gave the state a chance to clarify or change its position. *See Williamson*, 473 U.S. at 187 ("No [final] decision had been made at the time respondent filed its § 1983 action, because respondent failed to *apply for variances* from the regulations." (emphasis added)); *MacDonald*, 477 U.S. at 345–47. *id.* at 191 (no final decision had been made because, after the sate rejected the plaintiff's application, two state-court decisions held that the plaintiff's proposed use of the property was proper under the regulations at issue).

        Plaintiffs do not cite a single analogous case where a court concluded that a state agency reached a "final decision" before the landowner even applied for a permit or submitted a substantive proposal to develop the property. Nor have they cited a single case holding that a government official's preliminary statements on the viability of a hypothetical land development proposal constitutes a "final decision." Plaintiffs first rely on *Suitum*, which is entirely distinguishable because there the plaintiff "applied to the agency for permission to construct a house on her lot, the agency determined that her property was located within a SEZ, assigned it an IPES score of zero, and denied permission to build." 520 U.S. at 731. In fact, Ms. Suitum "appealed the denial to the agency' governing board, which itself denied relief." *Id.* The *Suitum* Court therefore held that "there [was] no question . . . about how the 'regulations at issue [apply] to the particular land in question,'" *id.* at 739 (quoting *Williamson*, 473 U.S. at 191), because "[i]t is undisputed that the agency 'has finally determined that petitioner's land lies entirely within an SEZ,' . . . and that it may therefore permit '[n]o additional land coverage or other permanent land disturbance' on the parcel," *id.* (first quoting Brief for Respondent at 21; then quoting TRPA Code § 20.4). Here, by contrast, there was no application for a permit, much less a denial of that application or an appeal to the California Coastal Commission.

        Plaintiffs' reliance on *Palazzolo v. Rhode Island* is also misplaced because the plaintiff there submitted not one, but *two* applications to develop his property: "the 1983 proposal to fill the entire parcel, and the 1985 proposal to fill 11 of the property's 18 wetland acres for construction of the beach club." 533 U.S. 606, 614–15, 619 (2001). Rhode Island argued that the plaintiff's

11

regulatory taking claim was not ripe because "while the Council rejected [his] effort to fill all of the wetlands, and then rejected his proposal to fill 11 of the wetland acres, perhaps an application to fill (for instance) 5 acres would have been approved." *Id.* at 619. The Supreme Court flatly rejected this argument:

> The rulings of the Council interpreting the regulations at issue, and the briefs, arguments, and candid statements by counsel for both sides, leave no doubt on this point: On the wetlands there can be no fill *for any ordinary land use*. There can be no fill for its own sake; no fill for a beach club, either rustic or upscale; no fill for a subdivision; no fill for any likely or foreseeable use. And with no fill there can be no structures and no development on the wetlands. Further permit applications were not necessary to establish this point.

*Id.* at 621. Unlike in *Palazzolo*, there is no decision here—much less *two* decisions—by the County or the Commission stating that Plaintiffs cannot build their home on the Property, let alone that the Property is not fit "for *any* ordinary land use." *Id.* Again, that decision will only come when the Plaintiffs apply for a CDP and submit a proposal for how they plan to use the Property, which will give the County or the Commission a chance to apply the County's LCP to that proposed project and consider whether a CDP may be granted with mitigation conditions where a takings would otherwise occur.

Finally, Plaintiffs rely on *Pakdel*, even though the facts of that case are even further afield what is alleged here. The plaintiffs in that case sought to avail themselves of San Francisco's recently adopted program whereby non-occupant owners of units in a multiunit residential building could "convert their tenancy-in-common interests into modern condominium-style arrangements, which allow individual ownership of certain parts of the building." 141 S. Ct. at 2228. But there was a catch: to avail themselves of the program, the plaintiffs "had to offer their tenants a lifetime lease." *Id.* Unlike Plaintiffs here, the *Pakdel* plaintiffs applied to convert the interests in their building, "agreed that they would offer a lifetime lease to their tenant," and "[t]he City approved the conversion." *Id.* It was only "*a few months later*" that the Pakdels "requested that the city either excuse them from executing the lifetime lease or compensate them for the lease." *Id.* (emphasis added). Therefore, contrary to Plaintiffs' interpretation, *Pakdel* does not— indeed it cannot—stand for the proposition that Plaintiffs need not formally apply for a CDP or

submit a meaningful development proposal before filing suit. The Pakdels applied to be part of San Francisco's conversion program, and there was in effect a final decision applying the conversion rules to them.

Indeed, the holding in *Pakdel* supports concluding that Plaintiffs regulatory taking claim here is unripe. The *Pakdel* Court concluded that San Francisco issued a "final decision" only because it had made it clear to the Pakdels that they had to issue the lease or face an enforcement action:

> In this case, there is no question about the city's position: Petitioners must "execute the lifetime lease" or face an "enforcement action." Brief for Respondents 9. And there is no question that the government's "definitive position on the issue [has] inflict[ed] an actual, concrete injury" of requiring petitioners to choose between surrendering possession of their property or facing the wrath of the government.

*Id.* at 2230 (quoting *Williamson*, 473 U.S. at 193). Here, by contrast, not only are Plaintiffs in no risk of facing an enforcement action from the County, but the County has repeatedly represented that there is a possibility—despite the Planning Director's preliminary statements—that it will allow them to build their home on the Property. *See* Cnty. Reply at 1 (stating that a formal application would "at least give the County the opportunity to review a sincere development proposal, apply its regulations to that proposal, and decide whether to approve, deny, or condition a development permit"), 5 ("By suing instead of applying for a permit, Plaintiffs have not given the County the opportunity to exercise [its] statutory discretion."); 6 ("The County's alleged communications with Plaintiffs about the Property have, so far, been minimal, informal, and preliminary. The possibility remains that the County's ultimate decisionmaker, reviewing a complete development proposal, could decide to permit Plaintiffs' desired project with appropriate environmental mitigation"). In fact, the *Pakdel* Court distinguished the facts before it from situations like the instant case by noting that "[t]o be sure, . . . a plaintiff's failure to properly pursue administrative procedures may render a claim unripe *if* avenues still remain for the government to clarify or change its position." *Id.* at 2231. The County in the instant case—unlike San Francisco in *Pakdel*—may clarify or even change its position if it is given a chance to apply the County's LCP to a concrete development proposal from Plaintiffs. Moreover, as the Planning

Director's testimonial view suggests, the determination whether an outright denial may constitute a takings which would warrant possible issuance of a CDP with conditions was a fact-specific issue turning on assessment of, *e.g.*, economic-based expectation to develop the property. Compl. ¶ 20. *See e.g.*, *Williamson*, 473 U.S. at 192–194 ("The Commission's refusal to approve the preliminary plat . . . leaves open the possibility that [the plaintiff] may develop the subdivision according to the plat after obtaining the variances"); *Knick*, 139 S.Ct., at 2169 ("[T]he developer [in *Williamson*] still had an opportunity to seek a variance from the appeals board"); *Cf. Palazzolo*, 533 U.S. at 624–625 ("[S]ubmission of [a] proposal would not have clarified the extent of development permitted . . . , which is the inquiry required under our ripeness decisions.").

Further, the County convincingly explains in its reply that it "cannot reach a final decision based on a tentative, hypothetical development proposal" because "site-specific boundary surveys, riparian buffer delineations, and biological studies are required to determine what development might be allowed on a parcel." *See* Cnty. Reply at 3, n. 3; *see also id.* at 6 ("A formal application would likely include details about the site plan, biological surveys, and other information that would be relevant to determining whether Plaintiffs could adopt an acceptable mitigation plan and avoid a taking."); Zoning Regulations § 6328.7 ("The application for a [CDP] shall be accompanied by [listing requirements]."). If the Court allows this lawsuit to proceed under the current posture, it would deprive the County of the opportunity to fully decide whether and how its LCP applies to Plaintiffs' Property.

Adjudicating Plaintiffs' regulatory taking claims without a final decision from the County would require the trier of fact to impermissibly speculate what land uses the County would allow on the Property. *Pakdel*, 144 S. Ct. at 2228 ("After all, until the government makes up its mind, a court will be hard pressed to determine whether the plaintiff has suffered a constitutional violation."). As the Supreme Court put it in *Suitum*, without a final decision the court is faced with "the virtual impossibility of determining what development will be permitted on a particular lot of land when its use is subject to the decision of a regulatory body invested with great discretion, which it has not yet even been asked to exercise." 520 U.S. at 739; *see also MacDonald*, 477 U.S. at 349 ("[The] effect [of the regulation] cannot be measured until a final

14

decision is made as to how the regulations will be applied to respondent's property." (quoting *Williamson*, 473 U.S. at 199–200)); *Kinzli v. City of Santa Cruz*, 818 F.2d 1449, 1454 (9th Cir.), *amended*, 830 F.2d 968 (9th Cir. 1987) ("[The] absen[ce of] any rejected development plan . . . would result in the same sort of speculation that the ripeness doctrine prohibits."). The purpose of the "final decision" rule is to protect courts from having to decide whether the state committed an unconstitutional taking based on impermissible speculation rather than on a concrete record.

Accordingly, the allegations in Plaintiffs' complaint, taken as true, do not establish that the County has issued a "final decision" rejecting an application for a CDP, and therefore their claim is not ripe.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** the County's motion to dismiss in its entirety without leave to amend because Plaintiff's claims are unripe. Plaintiffs may refile this action, if necessary, after they apply for a CDP and the County issues a final decision.

This order disposes of Docket Nos. 20 and 22. The Clerk shall enter Judgment and close the file.

**IT IS SO ORDERED**.

Dated: August 26, 2021

_____
EDWARD M. CHEN
United States District Judge

15